BRIDGES, P.J.,
for the Court.
¶ 1. Patricia Purnell applied for disability benefits from the State of Mississippi, having worked for the State for over ten years. The medical board reviewed Pur-nell’s application and denied her claim. Purnell appealed and pursuant to the Disability Appeals Committee’s recommendation, the Public Employees’ Retirement Board of Trustees upheld the medical board’s denial of benefits. Purnell then appealed to the Hinds County Circuit Court which likewise affirmed the Board’s decision. Aggrieved, Purnell appeals to this Court and asserts the following issues:
I. THE DECISION OF THE PUBLIC EMPLOYEES’ RETIREMENT SYSTEM (PERS) IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE BECAUSE THE DECISION OF BOTH THE DISABILITY APPEALS COMMITTEE AND THE CIRCUIT COURT IS CONCLUSORY, THE REPORTS OF PURNELL’S TREATING PHYSICIANS WERE IGNORED, THE INDEPENDENT MEDICAL EVALUATION OF DR. RICHARD KENNEDY WAS SUPPORTIVE OF PURNELL’S DISABILITY AND RECOMMENDED FURTHER TESTING WHICH PERS IGNORED AND THE DISABILITY APPEALS COMMITTEE FOUND PURNELL COULD NOT PERFORM HER JOB AND THEN STATED THE QUESTION OF DISABILITY TO BE “MOOT.”
II. PURNELL WAS NOT PROVIDED A FAIR AND IMPARTIAL HEARING AS DOCTOR RICHARD KENNEDY WAS A MEMBER OF THE DISABILITY APPEALS COMMITTEE AND HIS EXAMINATION WAS THEREFORE NOT INDEPENDENT.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. On November 17, 1998, Patricia Purnell applied for Public Employees’ Retirement System (PERS) disability pursuant to Mississippi Code Annotated Section 25-11-113. Fifty-five years old, Purnell worked for the State of Mississippi for over 10 years. During the vast majority of that time, Purnell worked as a maid in the home of former Mississippi State Universi *599 ty President Dr. Donald Zacharias. Dr. Zacharias retired and on April 20, 1998, Purnell was transferred to a position of Library Assistant II with the Mississippi State University Library. Purnell testified that the job change precipitated her health problems, though she asserts in her brief that she had numerous health problems prior to the change. On September 25, 1998, some six months after her transfer, Purnell took leave without pay due to inability to perform her duties.
¶ 4. Purnell’s Library Assistant II duties were significantly different from her responsibilities as a maid. Her duties at the library included preparing correspondence, bibliographies, invoices, donor agreements, and other written material. Purnell was also responsible for processing manuscript collections, assisting patrons at the special collections reference desk, supervising student workers, and performing related duties. The position generally required a bachelor’s degree although Purnell had only a high school education.
¶ 5. Purnell testified that it seemed as if her co-workers were talking about her and laughing at her and that she was not happy in her new position. She claimed that her supervisor embarrassed her and that other employees got raises while she did not, even though her pay rate in her previous position carried over, seeing to it that she made significantly more per hour than her colleagues. Purnell’s daughter testified that Purnell was moved to a position she did not have the qualifications for and that her new situation was “nerve wracking.” The Dean of Libraries noted on Purnell’s statement of job requirements that her job duties were changed in order to try to assist her in functioning on the job.
¶ 6. Purnell’s medical problems and records go back quite some time. As early as 1987 at age 44, Purnell had some elements of depression and anxiety. In 1993, Pur-nell informed her doctor that she stayed nervous and that she had bouts of depression. However, we must move forward to the events centered around Purnell’s quest for disability benefits.
¶ 7. Based on complaints of pain, Dr. William Bennett referred Purnell to Dr. V.V. Vedanarayanan, a neurologist in Jackson, Mississippi. On July 2, 1998, Dr. Bennett examined Purnell. Dr. Vedana-rayanan determined that Purnell had pain in her lower extremities secondary to lumbar stenosis, a condition caused by narrowing of the spinal canal. Dr. Vedana-rayanan concluded that Purnell should be allowed to pace her work as best she can and take rest whenever she is overcome by severe pain.
¶ 8. On September 28, 1998, three days after taking leave from the library, Purnell was admitted to Oktibbeha County Hospital. Purnell complained of lower extremity pain and an inability to move her left leg. Purnell was discharged on October 1, 1998, in stable condition with orders only to refrain from strenuous activities.
¶ 9. Purnell again saw Dr. Vedanarayan-an on October 5, 1998. Again, Purnell complained of upper and lower extremity pain. Dr. Vedanarayanan noted a great deal of anxiety and agreed with Purnell’s doctors in Starkville that she should see a psychiatrist.
¶ 10. On October 29, 1998, Purnell was admitted into Charter Hospital due to major depression. While admitted, Purnell underwent a complete physical examination. The physical indicated hypertension as well as failed back syndrome with decreased muscle strength. However, Pur-nell was physically able to participate in all aspects of the program. On November 2, 1998, Purnell was released from Charter *600 Hospital to return to work with no physical limitations or restrictions.
¶ 11. On November 9, 1998, Dr. Veda-narayanan spoke with Purnell on the phone. Purnell told Dr. Vedanarayanan that she was admitted to Charter Hospital and diagnosed with depression. Purnell asked Dr. Vedanarayanan to send her a letter attesting to her disability. Dr. Ve-danarayanan told Purnell he could not diagnose disability based on her depression because he only treated her for neuromus-cular problems. Purnell was released to return to work without restriction. Instead of returning to work, Purnell filed for disability on November 17,1998.
¶ 12. Dr. William Bennett admitted Purnell in the Oktibbeha County Hospital on December 17, 1998, with low back pain. On December 20, 1998, Purnell was discharged as ambulatory but with some continued low back pain but no declaration of disability.
¶ 13. Purnell next saw Dr. Vedanaray-anan on January 14,1999. Dr. Vedanaray-anan noted that Purnell told him that she was not able to work due to low back pain. Dr. Vedanarayanan - stated that he and Purnell discussed the findings of an MRI which did not indicate any significant evidence or symptoms to explain her pain. He also stated that Purnell’s underlying depression and anxiety probably made any discomfort seem much worse.
¶ 14. On February 15, 1999, Purnell reported an onset of slurred speech. She was admitted to Methodist Medical Center in order to rule out an embolism or stroke. On February 19, 1999, Dr. Vedanarayanan reported that Purnell had “lumbar steno-sis, neurogenic claudication, pain in upper limbs, depression, anxiety, and hypertension.” Dr. Vedanarayanan concluded that those conditions were disabling and permanent. On June 21, 1999, Dr. Bennett reported that Purnell had “neurogenic claudication, peripheral neuropathy, and serial positive spondyloarthropathy.” Dr. Bennett reasoned that all of which were chronic, severe, and had poor prognosis with the necessity of lifelong treatment.
¶ 15. On October 18,1999 Purnell found out that PERS was dénying her claim due to insufficient objective medical evidence to support her claim. Purnell appealed, asserting the fact that she was “mentally ill” as the facts upon which her appeal was taken. Purnell’s daughter attached a letter to the notice of appeal stating that Purnell was “not mentally stable enough to hold a job and this is the basics [sic] of her request for appeal.”
¶ 16. PERS referred Purnell to Dr. Richard Kennedy. On January 18, 2000, Dr. Kennedy reported that Purnell complained of “bad nerves.” Dr. Kennedy found moderate depressive and cognitive disorders. He noted that symptoms were vague and that he was uncertain how long treatment would be necessary. Dr. Kennedy was also uncertain whether the disorders were permanent. Based on his examination, Dr. Kennedy did not recommend disability based on depression or anxiety. Three months later, in March 2000, Dr. Kennedy was appointed a member of the Disability Appeals Committee.
¶ 17. After the medical review board and the PERS Board of Trustees upheld the denial of benefits, Purnell appealed to the Hinds County Circuit Court. The circuit court likewise affirmed the decision of the Board. Purnell appeals the circuit court’s ruling.
ANALYSIS
I. WAS THE DECISION OF THE PUBLIC EMPLOYEES’ RETIREMENT . SYSTEM (PERS) NOT SUPPORTED BY SUBSTANTIAL EVIDENCE BECAUSE THE DE *601 CISION OF BOTH THE DISABILITY APPEALS COMMITTEE AND THE CIRCUIT COURT WERE CONCLUSORY, THE REPORTS OF PURNELL’S TREATING PHYSICIANS WERE IGNORED, THE INDEPENDENT MEDICAL EVALUATION OF DR. RICHARD KENNEDY WAS SUPPORTIVE OF PURNELL’S DISABILITY AND RECOMMENDED FURTHER TESTING WHICH PERS IGNORED AND THE DISABILITY APPEALS COMMITTEE FOUND PURNELL COULD NOT PERFORM HER JOB AND THEN STATED THE QUESTION OF DISABILITY TO BE “MOOT”?
¶ 18. Under proper circumstances, employees of the State of Mississippi are entitled to disability retirement benefits under the Public Employees’ Retirement System. Public Employees’ Retirement System v. Dishmon, 797 So.2d 888(114) (Miss.2001). Those circumstances are listed in Section 25-11-113 of the Mississippi Code. Under such, “any active member in state service who has at least four (4) years of ... service ... may be retired ... provided that the ... member is mentally or physically incapacitated for the further performance of duty [and] that such incapacity is likely to be permanent....” Miss.Code Ann. § 25 — 11— 113(l)(a) (1999).
¶ 19. A person may be disabled according to certain standards dictated by statute. One is disabled where he is unable “to perform the usual duties of employment.” Id. Besides a lack of ability to perform the usual duties of employment, one must also be unable “to perform such lesser duties, if any, as the employer ... may assign without material reduction in compensation.” Id. Finally, there must be a finding that the employee seeking benefits is unable “to perform the duties of any employment covered by the PERS that is actually offered and is within the same general territorial work area, without material reduction in compensation.” Id.
¶ 20. Once PERS renders a decision on eligibility of benefits, there is a rebuttable presumption in favor of that decision. Dishmon, 797 So.2d at (¶ 9). Neither this Court nor the circuit court is entitled to substitute its own judgment for that of PERS, nor may we re-weigh the facts of the case. Id. We must affirm if substantial evidence existed to support the agency’s decision, but reverse if the decision crosses the threshold of being arbitrary and capricious. Id.
¶21. After examining the record, we determine that substantial evidence existed in favor of PERS’ ruling. Purnell was transferred to the library on April 20, 1999, and stopped working on September 25, 1998. Suzietta Swan, Purnell’s daughter, testified that Purnell was unable to cope with leaving her employment as a maid with Dr. Zacharias. Swan further stated that Purnell was happy in her employment as a maid, but was unhappy when transferred to the Mississippi State library. Purnell also testified that she was unhappy at that position. Purnell believed that her co-employees harbored resentment against her because she earned a higher pay rate than they. She stated that she perceived that they were gossiping about her. Purnell reported that she could not deal with working at the library. Moreover, Purnell requested a declaration of disability from Dr. Vedanarayanan on November 9, 1998 based on psychiatric disabilities, but Dr. Vedanarayanan could only diagnose on the basis of her pain. No treating physician ever diagnosed Purnell as permanently disabled due to mental problems. While there was evidence that Purnell suffered from chronic pain, there was also evidence that doctors could not discern any cause for such.
*602 ¶ 22. To clarify, we do not suggest that Purnell actively sought disability to escape her unpleasant employment, as that is not our concern. But we can determine that although some medical evidence suggested that Purnell, at times, suffered physical and mental difficulties, substantial evidence also suggested that there was no distinguished reason for pain or any notion of the permanence of Purnell’s maladies. Because there existed evidence to support PERS’ ruling in which the agency denied Purnell’s eligibility to receive disability benefits, this issue lacks merit.
II. WAS PURNELL NOT PROVIDED A FAIR AND IMPARTIAL HEARING AS DOCTOR RICHARD KENNEDY WAS A MEMBER OF .THE DISABILITY APPEALS COMMITTEE AND HIS EXAMINATION WAS THEREFORE NOT INDEPENDENT?
¶ 23. Dr. Kennedy evaluated Pur-nell on December 23, 1999 and reported that Purnell was not disabled due to depression or anxiety. He did find cognitive impairment on testing Purnell but because Purnell did not endorse any symptom of cognitive impairment in her daily life, Dr. Kennedy did not diagnose any disability attributable to such impairment.
¶ 24. In March of 2000, Dr. Kennedy was appointed to the Disability Appeals Committee. Purnell’s hearing before the Disability Appeals Committee took place on April 14, 2000. Ordinarily, three members would adjudicate such a claim, but only two members heard Purnell’s, as Dr. Kennedy recused himself to avoid an impression of prejudice or lack of impartiality. Purnell argues that Dr. Kennedy’s influence was still present at her hearing, his recusal notwithstanding. Further, she contends that the totality of the circumstances suggests a suspicion of unfairness or prejudice.
¶25. In this issue, Purnell com plains that Dr. Kennedy improperly influenced the Disability Appeals Committee and prejudiced her quest to receive disability benefits. In Purnell’s first assignment of error, Purnell argued that Dr. Kennedy’s evaluation indicated that Purnell was disabled. It seems counterintuitive to argue that PERS ignored Dr. Kennedy’s report that supported a finding of disability, only to claim in her next assignment of error that Dr. Kennedy’s latent influence tainted the Disability Appeals Committee to the degree that they were convinced to deny Purnell’s eligibility for benefits. If anything, it seems that if Dr. Kennedy determined, as Purnell argued, that disability was warranted, Dr. Kennedy’s influence would lean more towards benefitting Pur-nell, rather than causing her to suffer prejudice. Regardless, we are at a loss to determine any further steps that the Disability Appeals Committee could take to remove any prejudice aside from Dr. Kennedy’s recusal. It would be impossible for the two remaining members to wipe Dr. Kennedy’s existence from their memory and we can do no more than speculate that Purnell was prejudiced, as no evidence suggests such. That being said, this issue is without merit.
¶ 26. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE, IRVING, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.